## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## HATTIESBURG DIVISION

**ZACHARY LADNER, A MINOR, BY KRYSTAL LADNER,**
**NATURAL GUARDIAN AND NEXT FRIEND**                                 **PLAINTIFF**

**VS.**                                                      **CAUSE NO. 2:12CV19-KS-MTP**

**FORREST GENERAL HOSPITAL,**
**PICAYUNE EYE CLINIC, P.A. d/b/a**
**PICAYUNE EYE CLINIC and LORI L. BLACKMER, M.D.**          **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Defendant Forrest General Hospital's

("Forrest General") Motion for Summary Judgment [62]; Defendants Picayune Eye

Clinic, P.A. d/b/a Picayune Eye Clinic ("Picayune Eye Clinic") and Lori L. Blackmer,

O.D.'s ("Dr. Blackmer")[1] Motion for Summary Judgment [65]; Plaintiff Zachary Ladner's

Motion to Strike the Expert Reports of the Defendants' Experts Attached to the Motion

for Summary Judgment Filed by Defendant Forrest General and the Motion for

Summary Judgment Filed by the Defendants Picayune Eye Clinic and Dr. Blackmer

("Motion to Strike Defendants' Expert Reports") [71]; Forrest General's Motion to Strike

Plaintiff's Reply to Forrest General's Response to Plaintiff's Motion to Strike Expert

Reports ("Motion to Strike Plaintiff's Reply") [81]; and Picayune Eye Clinic and Dr.

Blackmer's Motion to Strike Plaintiff's Reply to Dr. Blackmer and Picayune Eye Clinic's

Response to Plaintiff's Motion to Strike Expert Reports ("Motion to Strike Plaintiff's

Reply") [82].  Having considered the submissions of the parties, the record and the

---

[1] Although the Complaint refers to Dr. Blackmer as an "M.D.", the parties have referred to her as a "D.O." in numerous subsequent filings.  In either event, no one disputes that this Defendant is a "Dr."

applicable law, the Court finds that:

1)      Forrest General's Motion for Summary Judgment [62] should be denied;

2)      Picayune Eye Clinic and Dr. Blackmer's Motion for Summary Judgment [65] should be denied;

3)      Plaintiff's Motion to Strike Defendants' Expert Reports [71] should be denied as moot;

4)      Forrest General's Motion to Strike Plaintiff's Reply [81] should be denied as moot; and

5)      Picayune Eye Clinic and Dr. Blackmer's Motion to Strike Plaintiff's Reply [82] should be denied as moot.

## BACKGROUND

This action alleges medical malpractice in relation to the care and treatment of Zachary Ladner (sometimes referred to as "Plaintiff") for an injury to his left eye. On November 5, 2009, at approximately 6:52 p.m., Zachary Ladner, a minor child, presented to the emergency department of Highland Community Hospital ("Highland") in Picayune, Mississippi, in the company of his mother, Krystal N. Ladner. Highland is a division of the Defendant Forrest General. In turn, Forrest General is a "community hospital", as defined by Mississippi law,[2] with its principal offices in Hattiesburg,

---

[2] Generally, a Mississippi community hospital is a health care facility owned by a county or municipality and operated by a board of trustees appointed by the county or municipality. Specifically, "community hospital" means "any hospital, nursing home and/or related health facilities or programs, including without limitation, ambulatory surgical facilities, intermediate care facilities, after-hours clinics, home health agencies and rehabilitation facilities, established and acquired by boards of trustees or by one or more owners which is governed, operated and maintained by a board of trustees." Miss. Code Ann. § 41-13-10(c).

Mississippi.  Zachary Ladner presented to Highland with a complaint of being struck in the left eye with a piece of floor tile.  Dr. James Winder, the emergency department physician at Highland, examined the Plaintiff and after consulting with the Defendant Dr. Blackmer by telephone, discharged him with instructions to visit Dr. Blackmer's office, the Picayune Eye Clinic, the following morning so that he could be "worked in."  Plaintiff alleges that Dr. Winder "negligently misdiagnosed the full thickness laceration of plaintiff's left eye as an abrasion, failed to appreciate the emergent issues presented by a full thickness traumatic laceration of the eye or open globe injury and attempted a perfunctionary and inadequate consultation by telephone with defendant Dr. Lori Blackmer, who negligently declined to come in and examine Zachary's eye . . . ." (Compl. [1] at ¶ 15.)

The following morning, on November 6, Krystal Ladner brought Zachary Ladner to the Picayune Eye Clinic and was purportedly advised by an unknown individual that he did not treat children, but that she could return after 1:00 p.m., when Dr. Blackmer might be present.  At approximately 1:00 p.m. on November 6, Zachary Ladner was seen by Dr. Hautot, an optometrist with the Picayune Eye Clinic, who diagnosed him with a penetrating corneal laceration of the left eye with an abnormal pupillary response. Krystal Ladner was advised to take her son to Forrest General in Hattiesburg for emergency surgical repair of the corneal laceration.

At approximately 5:46 p.m. on the afternoon of November 6, Krystal Ladner and Zachary Ladner arrived at Forrest General.  At that time, Forrest General had no ophthalmological coverage and efforts to obtain such coverage proved unsuccessful.  At approximately 7:44 p.m., Zachary Ladner was discharged from Forrest General with

directions to proceed to the University of Mississippi Medical Center ("UMMC") in Jackson for care and treatment.

At approximately 10:30 p.m. on November 6, Zachary Ladner, in the company of his parents, arrived at UMMC's emergency department. Following consultation with an ophthalmologist, Dr. Farrah Newman, Plaintiff was taken to surgery at approximately 1:35 a.m. on the morning of November 7. Dr. Newman performed the surgery, which involved repair of the full thickness laceration of Plaintiff's cornea and which was completed at approximately 3:00 a.m. No intraoperative or immediate postoperative complications were noted at UMMC. Further, wound cultures revealed no active infection. Zachary Ladner was discharged from UMMC during the afternoon of November 9, 2009.

Plaintiff underwent several follow-up examinations and treatments for his left eye at UMMC in 2010 and the early part of 2011. For instance, an examination under anesthesia performed on January 6, 2010 revealed a dense cataract of the lens, but no endophthalmitis (infection or inflammation), vitreous hemorrhage (leakage of blood into the vitreous humor of the eye), retinal detachment or an intraocular mass. On March 24, 2010, Plaintiff was to undergo cataract surgery. However, the procedure was not completed and the Plaintiff was referred to a retinal specialist due to the existence of scar tissue and a subluxed (off-center) lens. On August 9, 2010, Plaintiff was seen by Dr. Ching Chen, a retinal specialist, for his traumatic cataract with subluxed lens. On September 28, 2010, another examination under anesthesia revealed rubeosis iridis (abnormal blood vessels on the surface of the iris), retinal dialysis (tears of the retina) and subretinal fibrosis (development of fibrous tissue) with localized retinal detachment.

-4-

Dr. Chen also implanted an intraocular lens during the September 28 procedure.

UMMC records dated November 29, 2010, reflect a history of trauma on November 25,

2010.  On January 21, 2011, an ophthalmologist at UMMC, Dr. Hancock, examined the

Plaintiff and noted that there was blood in his left eye.  Dr. Hancock recommended

another examination under anesthesia and an anterior chamber washout within one

week, which the family declined.

On March 22, 2011, Plaintiff was taken to surgery for the last time.  During this

procedure, Dr. Chen noted hyphema (blood in the anterior chamber of the eye) with

recurrent vitreous hemorrhage and funnel retinal detachment.  Dr. Chen attempted to

repair the retinal detachment, but was unsuccessful.  Further, the intraocular lens

previously implanted was removed.  Plaintiff's postoperative diagnosis was that of

proliferative vitreoretinopathy with funnel retinal detachment.  Plaintiff has no meaningful

vision in his left eye.

On February 6, 2012, Zachary Ladner, by and through his mother and natural

guardian Krystal Ladner, filed his Complaint [1] in this Court.  Subject matter jurisdiction

is asserted on the basis of diversity of citizenship under Title 28 U.S.C. § 1332.

Zachary Ladner and Krystal Ladner are citizens of Louisiana, while Forrest General, the

Picayune Eye Clinic and Dr. Blackmer are citizens of Mississippi for purposes of

diversity jurisdiction.  (*See* Compl. [1] at ¶¶ 1, 2, 5, 6, 9.)  The amount in controversy,

exclusive of interest and costs, exceeds the sum or value of $75,000.  (*See* Compl. [1]

at ¶¶ 9, 20.)

Ultimately, Plaintiff claims that the loss of vision in his left eye is the result of the

Defendants' failure to recognize the need for immediate surgical repair, resulting in an

unnecessary dely of more than thirty (30) hours between the time Plaintiff presented to Highland on November 5 and his surgery at UMMC during the early morning hours of November 7.  (*See* Compl. [1] at ¶¶ 19-20.)  The Defendants deny all liability and have moved for summary judgment on the basis that there is an absence of proof on the "causation" element of Plaintiff's medical negligence claim.  All of the pending motions have been fully briefed and the Court is ready to rule.

I.      **Forrest General's Motion for Summary Judgment [62] and Picayune Eye Clinic and Dr. Blackmer's Motion for Summary Judgment [65]**

A.      **Standard of Review**

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation and internal quotation marks omitted).  The nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* "'An issue is material if its resolution could affect the outcome of the action.'" *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)).  "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812.

The Court is not permitted to make credibility determinations or weigh the

evidence.  *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).  When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Sierra Club, Inc.*, 627 F.3d at 138.  However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."  *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).  Summary judgment is mandatory "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)), *cert. denied*, 132 S. Ct. 2103 (2012).

### B.     Analysis

Forrest General's Motion for Summary Judgment [62] and the Motion for Summary Judgment [65] of Dr. Blackmer and the Picayune Eye Clinic are substantially identical.  The Defendants focus on the issue of "causation" and contend that the deposition testimony of the Plaintiff's sole ophthalmology expert, Dr. David Meyer, fails to create a genuine issue of material fact precluding summary judgment.  The substantive law of Mississippi applies to this issue in this diversity action.  *See Hunnicutt v. Wright*, 986 F.2d 119, 122 (5th Cir. 1993) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

In order to recover on a medical malpractice claim in Mississippi, a plaintiff must

show the following:

> (1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury, and (4) the plaintiff was injured as a result.

*McComb Nursing & Rehab. Ctr., LLC v. Lee*, 99 So. 3d 776, 779 (¶ 8) (Miss. Ct. App. 2012) (quoting *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 650 (¶ 15) (Miss. 2009)), *cert. denied*, 98 So. 3d 1073 (Miss. 2012). These elements must be proven through expert medical testimony unless "'a layman can observe and understand the negligence as a matter of common sense and practical experience.'" *Magee v. Covington County Sch. Dist.*, 96 So. 3d 742, 747 (¶ 15) (Miss. Ct. App. 2012) (quoting *McGee v. River Region Med. Ctr.*, 59 So. 3d 575, 578 (¶ 9) (Miss. 2011)), *cert. denied*, 97 So. 3d 79 (Miss. 2012). No contention is made that the layman's exception to the requirement of expert medical testimony applies in this case.

As to the salient issue of proximate cause, the expert's opinion "must be expressed in terms of medical probabilities as opposed to possibilities." *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1202 (¶ 20) (Miss. 2012) (citing *Pittman v. Hodges*, 462 So. 2d 330, 333-34 (Miss. 1984)). If a medical expert is unable to reach an opinion with sufficient certainty as to constitute a medical judgment, the jury cannot rely on the expert's testimony to reach its decision. *See id.* at 1203 (¶ 22). At the same time, "absolute certainty" is not the appropriate measure of expert medical testimony. *See, e.g.*, *Estate of Gibson v. Magnolia Healthcare, Inc.*, 91 So. 3d 616, 625 (¶ 22) (Miss. 2012); *Blake v. Clein*, 903 So. 2d 710, 731 (¶ 62) (Miss. 2005); *Pittman*, 462 So. 2d at 334. The Mississippi Supreme Court has recognized "that the plaintiff is rarely able to

prove to an absolute certainty what would have happened if early treatment, referral or surgery had happened."  *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985). Thus, causation may be established through circumstantial evidence so long as the circumstances shown "take the case out of the realm of conjecture and place it within the field of legitimate inference."  *Estate of Gibson*, 91 So. 3d at 625 (¶ 22).

Where the plaintiff's claim is that the defendant's improper care allowed an existing injury or disease to deteriorate, the plaintiff must show that the malpractice resulted in the deprivation of a reasonable probability of substantial improvement in his condition.  *Clayton*, 475 So. 2d at 445.  "Stated differently, the plaintiff must show that, absent malpractice, there is a greater than fifty-percent chance that a substantially better result would have followed."  *Griffin v. N. Miss. Med. Ctr.*, 66 So. 3d 670, 673 (¶ 9) (Miss. Ct. App. 2011) (citing *Hubbard v. Wansley*, 954 So. 2d 951, 964 (¶ 42) (Miss. 2007)).  Mere diminishment of a "chance of recovery" will not support liability under Mississippi law.  *Hubbard*, 954 So. 2d at 964 (¶ 42).

Defendants take the position that Dr. Meyer failed to state his causation opinion to a reasonable degree of medical certainty, and that "the sum and substance of his testimony at best is that a period of greater than 30 hours after Zachary Ladner's initial examination and before a repair of the corneal laceration was performed resulted in diminishment of a 'chance of recovery.'"  (Mot. for SJ [62] at p. 14; Mot. for SJ [65] at p. 10.)  The Court takes a different position based on the following portions of Dr. Meyer's deposition testimony:

> Q:   (By Mr. Ramsey) Let me start with this [Dr. Meyer's November 8, 2012 opinion letter].  It says: It is the opinion of this writer that the delay of nearly 34 hours before proper treatment was rendered, more likely than

not, removed the opportunity to save this young man's sight.

A:    Just read it?  I wrote it.

Q:    Yes sir.  My question to you is this:  Is it anticipated that you're going to render an opinion that, to a reasonable medical probability, had surgery intervention been performed earlier, that, more likely than not, this young man would not have had some of the complications that he, in fact, did experience in the year 2010?

A:    Yes.  That's exactly what I wrote.

Q:    What are the complications you're referring to?

A:    Well, if an eye is left open, what happens is the eye remains soft.  If the eye remains soft, four things can occur.  There was much more that occurred in this case.  No. 1, there's a period of severe hypotony, which is lowering of the pressure, which occurred in this patient.  I don't have any notes in front of me but I believe it was over a 24-hour period and probably closer to 36 hours.  It is an absolute ocular emergency to recognize an open globe for the reason as well of endophthalmitis which is a subtle -- or can be a rapid -- inflamation.

Q.    Just a second.  Endo --

A.    Endophthalmitis.

Q.    -- phthalmitis.  Okay.

A:    Right.  A severe propensity to vitreous, which is the gel of the eye, hemorrhage.  Effusion.

Q:    What is that?

A:    It starts with an E.  That occurs in the choroidal layer beneath the retina.  Retinal detachment.  And if, indeed, you close an open globe, the likelihood of that occurring is much, much, much improved.

Q:    Let's see.  Are you telling me that the likelihood of any of these events occurring is significantly reduced?

A:    Significantly reduced.

Q:    Let me go to the hypotony.  Is that h-y-p-o-t-e-n-y (sic)?

A:      That is correct.

Q:      That simply means lack of pressure?

A:      A lack of pressure.

Q:      All right.

A:      The eye cannot function to build up the pressure and that's why all of the structures have further damage.

Q:      Yes, sir.  Now, you indicated that these are things that can occur with a lapse of time?

A:      That is correct.

Q:      Endophthalmitis?

A:      That's correct.

Q:      Do you have any indication or suggestion in this record that this young man ever suffered from any form of infectious endopthalmitis?

A:      I don't think there's any doubt that he did if you'll look back at what occurred later.  But I wasn't there and I didn't see it.  But he had, in the end results, a fibrotic retina with what's called PVR, which is proliferative vitreoretinopathy, which is always a result of inflamation.  It doesn't just occur.  Now, that's a retrospective study by me reading a chart when repairs were done the next year.

Q:      Yes, sir.

A:      Not at the time of the surgery, I think in 2009.  The initial surgery and incident.  And so I'm reading that all of that occurred. He also had in addition to that --

        . . . .

A:      He also had, as an indication by that, a scar that subluxed -- meaning moved his lens -- a cataractous lens from that inflamation called facolitico reaction.  All of that is likely.  Because I'm reading a chart that occurred -- excellent chart -- from the University of Mississippi Medical Center when the surgeries were performed.  And I would have to speculate -- I have a good memory even with the flu -- this was in January and in the spring and

-11-

later.  There were three surgeries, if I remember.  So I don't think -- I don't know of any reason for that to occur.  And the second and main cause --

Q:   You're talking about the subluxation?

A:   No, I'm talking about the whole process.  And in addition to that, the patient didn't have any vision.  That would be above and beyond everything that's over here that occurred later.  Nobody recorded a visual acuity.  Maybe hand motion, maybe counting fingers initially.  But all that is a retrospective study, which is not in any way confirmed by my observation.

Q.   Let me ask you this.

A.   Sure.

Q.   In your review of the records did you find at any time any evidence of, or observation of, endophthalmitis?

A:   Let me repeat what I said.  I might not have been clear.  I found evidence, 100 percent, that the things that I've described there led to an observation that occurred at surgery.  He had total fibrosis, he had a retinal detachment, he had vitreous hemorrhage, he had a subluxed lens, he had a cataractous lens, and he had a severe corneal scar among other things.

Q:   I'm fine.  What I'm hearing you say is the fact that he had fibrosis, the fact that he had a retinal detachment, and the fact that he had -- I forgot the third thing you mentioned.

A:   A subluxed lens.

Q:   Yeah.  All of this was proof positive that, in fact, he had had a period of endophthalmitis?

A:   You've quoted me wrong.  You said: Proof positive.  I never said "proof positive."  I said to my best knowledge, most likely, if you leave an open globe, as occurred in this young man, those things occur.  I have no proof in my mind.  That I saw the patient, which I didn't.

Q:   Right.

A:   Most likely.

Q:   If a patient has endophthalmitis, what are the signs and symptoms associated with it in the course of acute care?

A:     The long-term sequela of what happened to this young man not just related to endophthalmitis.  That was one of the things that you asked me could it occur.

        . . . .

[Q.]   My question to you is:  Within what period had surgical intervention to close the globe been performed -- I'm trying to think of my question.  You say there was a period of more than 30 hours.  Within what period had surgical intervention been performed do you believe, to a reasonable medical probability, these complications wouldn't have occurred?  And by that I mean dialysis of the retina, vitreous hemorrhage, and ultimately proliferative retinopathy.

A.     Would have been helped?  I believe there are two emergencies -- both in training of residents and Fellows, and training by myself in Boston, Philadelphia -- the two key emergencies, even above retinal detachment, which is hours, is an open globe, No. 1; and, again, as we've spoken of, the word endophthalmitis.  Now, in this case the delay, it's only my opinion that these sequela came from that.  I don't know whatever else could have occurred.  But, again, it's looking back.  But I would say, you know, if this could have been accomplished and proper care given, which I'm sure it would have been, at the time of initial -- at the time of the initial trauma that day, it would have been very, very important.  And I would say if that could have occurred in two to three hours, to four hours, if it was possible, it would have been very important.  Now, reasonable certainty?  As you said, you know things happen.  Not everything happens that way.  We see people from areas where I was born and raised that don't get to the hospital quickly.  But 30 hours, I would think, would be very excessive.  But that's just my opinion.

Q.     Had surgical intervention transpired within a period of 24 hours, are you expected to render an opinion that the sequela, the complications suffered by this young man, would, more likely than not, not have occurred?

A.     I don't know if I could give you a fine line of 24 hours.  But I can tell you in excess of four hours of hypotony it would be my opinion that the sequela were closely related to this trauma that wasn't fixed.

Q.     Am I to understand then, based upon your last answer, that a surgical intervention at any time after four hours carried with it significantly greater risk of these complications occurring?

A.     I would add -- yes.  I would add to that that each of the hours subsequent it's just like any trauma.  Yes.  It's no different than any other trauma.

-13-

(Dr. Meyer Dep. [62-3] at pp. 18-24, 73-75.)

Viewing this evidence and the resulting inferences in the light most favorable to the Plaintiff, the Court finds the *import* of Dr. Meyer's testimony to be that "to a reasonable degree of medical certainty or . . . probability" the delay between Plaintiff's initial presentation to Highland and his first surgery at UMMC "more likely than not" resulted in certain complications, including the loss of vision in Plaintiff's left eye. *Powell v. Stewart*, No. 2:04cv290, 2006 WL 3335515, at *6 (S.D. Miss. Nov. 16, 2006).  Stated differently, a fact issue exists as to whether the delay in Plaintiff's care resulted "in the loss of a reasonable probability of substantial improvement of the patient's condition." *Id.*  That Dr. Meyer failed to use these exact terms in his deposition answers, state his opinions with absolute certainty, or identify the specific hour upon which the development of Plaintiff's ocular complications became probable, does not preclude his opinions from being presented to the finder of fact at trial.[3]

---

[3] *See Powell*, 2006 WL 3335515, at *6-7 (finding that the deposition testimony of plaintiff's expert witness, viewed in the light most favorable to the plaintiff, precluded summary judgment even though the expert did not explicitly "opine to a 'reasonable medical probability' or 'reasonable medical certainty'"); *Estate of Gibson*, 91 So. 3d at 625 (¶ 22) ("[A] medical expert does not have to testify with 'absolute certainty,' but testimony, taken as a whole, must establish 'reasonable medical certainty' that the negligence caused the injuries at issue."); *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 796 (Miss. 1995) ("There is no magic form to which a plaintiff's supporting expert opinion must conform, so long as its import is apparent.") (citation omitted); *Vanlandingham v. Patton*, 35 So. 3d 1242, 1249 (¶ 37) (Miss. Ct. App. 2010) (determining that expert testimony was admissible despite the expert "not always us[ing] the magic words 'within a reasonable degree of medical certainty or probability'" since the import of the testimony was apparent); *Partin v. N. Miss. Med. Ctr., Inc.*, 929 So. 2d 924, 932 (¶ 28) (Miss. Ct. App. 2005) ("While, admittedly, we do not see the specific terms 'breach' and 'causation' used in the language of the [expert's] affidavit, we do see the specific terms 'standard of care' and 'duty,' and we most definitely see the meaning or import of all of those terms expressed in the language of the affidavit.").

Defendants' spin on some of the above-quoted testimony and focus on other segments of Dr. Meyer's deposition answers do not warrant a grant of summary judgment in their favor.  In essence, Defendants contend that Dr. Meyer's testimony on the issue of causation, viewed as a whole, is not stated in terms of reasonable medical probability, and that any initial testimony meeting this standard was negated by subsequent equivocations or recantations.  The Court is unable to agree at this stage of the proceeding.

First, accepting these positions would require the Court to construe all inferences in favor of the Defendants, the parties seeking summary judgment.  This Court must "construe all facts and inferences in the light most favorable to the nonmovant" upon a request for summary judgment.  *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009) (citation omitted); *accord Partin*, 929 So. 2d at 932 (¶ 29) (rejecting the defendant's invitation for the court to draw negative inferences from the affidavit of plaintiff's expert witness in partially reversing the trial court's grant of summary judgment).  Second, the purported conflicts or inconsistencies referenced by Defendants go toward the weight or credibility of Dr. Meyer's testimony, not its admissibility.  "Once a witness is qualified as an expert to render expert testimony, then it is within the province of the trier of fact to give weight and credibility to the testimony."[4] *Palmer*, 656 So. 2d at 796; *see also Vanlandingham*, 35 So. 3d at 1249 (¶ 38) (finding that it was for the jury to assign credibility to an expert witness's various causation

---

[4] Defendants have not challenged Dr. Meyer's qualifications to provide expert medical testimony.

theories).  The Defendants will be permitted to question Dr. Meyer about any of his opinions they deem inharmonious via cross-examination at trial.

In sum, there are sufficient facts in dispute on the element of causation to preclude the entry of judgment in the Defendants' favor as a matter of law.  *See* Fed. R. Civ. P. 56(a).  Moreover, no showing has been made that Plaintiff lacks sufficient evidence on the other essential elements of his medical negligence claim to avoid summary judgment.  *Cf. Johnson v. La. (Bd. of Trustees for State Colls. & Univs.)*, 757 F.2d 698, 708 (5th Cir. 1985) (providing that summary judgment must be denied if the moving party fails to show the absence of a genuine issue of material fact–even if the nonmovant does not respond to the motion) (citations omitted).  Accordingly, Defendants' requests for summary judgment will be denied.

II.     **Plaintiff's Motion to Strike Defendants' Expert Reports [71], Forrest General's Motion to Strike Plaintiff's Reply [81] and Picayune Eye Clinic and Dr. Blackmer's Motion to Strike Plaintiff's Reply [82]**

All of these motions will be denied as moot.  Plaintiff's Motion to Strike Defendants' Expert Reports [71] challenges the Defendants' submission of unsworn expert reports in support of their summary judgment motions.  The sworn or unsworn nature of the opinions of Defendants' expert witnesses has no bearing on whether the Plaintiff has presented sufficient expert testimony in support of his medical malpractice claim to proceed to trial.  Defendants' Motions to Strike [81], [82] principally take issue with the Plaintiff filing an affidavit from Dr. Meyer addressing proximate cause subsequent to the close of briefing on the issue of summary judgment.  The Court need not address this issue since its ruling on summary judgment is based on Dr. Meyer's deposition testimony, as opposed to his late affidavit.

## CONCLUSION

For the foregoing reasons:

IT IS ORDERED AND ADJUDGED that Forrest General's Motion for Summary Judgment [62] is denied.

IT IS FURTHER ORDERED AND ADJUDGED that Picayune Eye Clinic and Dr. Blackmer's Motion for Summary Judgment [65] is denied.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's Motion to Strike Defendants' Expert Reports [71] is denied as moot.

IT IS FURTHER ORDERED AND ADJUDGED that Forrest General's Motion to Strike Plaintiff's Reply [81] is denied as moot.

IT IS FURTHER ORDERED AND ADJUDGED that Picayune Eye Clinic and Dr. Blackmer's Motion to Strike Plaintiff's Reply [82] is denied as moot.

SO ORDERED AND ADJUDGED this the 18th day of July, 2013.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE